**NOT FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER**

**Electronically Filed**
**Intermediate Court of Appeals**
**CAAP-19-0000668**
**22-JAN-2024**
**08:04 AM**
**Dkt. 77 MO**

NO. CAAP-19-0000668

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

ROWENA AKANA, Respondent-Appellant-Appellant,
v.
HAWAIʻI STATE ETHICS COMMISSION, Complainant-Appellee-Appellee,
and
DANIEL M. GLUCK, EXECUTIVE DIRECTOR

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CASE NO. 1CC191000379)

**MEMORANDUM OPINION**
(By: Leonard, Acting Chief Judge, Hiraoka and Nakasone, JJ.)

After a contested case hearing, the Hawaiʻi State Ethics **Commission** determined that Rowena **Akana** violated the Hawaiʻi code of ethics and imposed an administrative fine. Akana appealed. The Circuit Court of the First Circuit affirmed.[1] Akana filed this secondary appeal. We affirm.

**I. BACKGROUND**[2]

Akana was an elected member of the Board of Trustees of the Office of Hawaiian Affairs (**OHA**). She had served as an OHA

---

[1] The Honorable James H. Ashford presided.

[2] Some of the background comes from the Commission's findings of fact which Akana has not challenged on appeal. See Poe v. Haw. Lab. Rels. Bd., 97 Hawaiʻi 528, 536, 40 P.3d 930, 938 (2002) ("Unchallenged findings are binding on appeal." (citation omitted)).

trustee for 28 years, until 2018. OHA trustees receive a salary plus an annual allowance — funded by OHA trust funds — intended to improve the trustees' ability to communicate with and help OHA beneficiaries.[3] OHA's Executive Policy Manual required that trustees "abide by the Standards of Conduct of the State of Hawaiʻi, Chapter 84, Hawaii Revised Statutes[.]" Trustees had to attend the ethics training course conducted by the Commission (as were legislators, members of the board of education, the governor, the lieutenant governor, and executive department heads and deputies). At least every other year, trustees were reminded by OHA staff or the Commission about their HRS Chapter 84 obligations. OHA staff gave trustees gift disclosure forms and reminded them of the rules about receiving and giving gifts.

On April 19, 2018, the Commission charged Akana with violating Hawaii Revised Statutes (**HRS**) § 84-11 (the **Gifts Law**), HRS § 84-11.5 (the **Gifts Reporting Law**), and HRS § 84-13 (the **Fair Treatment Law**). These laws are part of the **Code of Ethics**, Part II of HRS Chapter 84. Akana denied violating the law. She alleged that the Commission "does not have jurisdiction over the discretionary spending accounts of the OHA Trustees, since such funds comprise 'trust funds' and do not constitute 'state funds[.]'" She also alleged that the charges violated her rights under the Hawaiʻi Constitution. The Commission entered the **Order Regarding Jurisdictional and Constitutional Issues** Raised by Respondent. It concluded it had jurisdiction over the charges against Akana under article XIV of the Hawaiʻi Constitution and HRS Chapter 84.

A contested case hearing was held on October 22, 24, 25, and 26, 2018. On February 5, 2019, the Commission entered its Findings of Fact, Conclusions of Law, and **Decision and Order**. It determined that Akana violated the Gifts Reporting Law, the Gifts Law, and the Fair Treatment Law. It imposed an

---

[3] From 1991 to 2013, the allowance was $7,200 per trustee. In 2013 the allowance was increased to $22,200 per trustee.

administrative fine of $23,106.53. It also filed a complaint and referred the matter to the Attorney General.

Akana appealed to the circuit court. She moved to stay enforcement of the Decision and Order. The circuit court denied the motion. She also moved to let additional evidence be presented on appeal. The circuit court denied the motion.

On September 24, 2019, the circuit court entered an order affirming the Commission's Decision and Order, and a judgment. Akana's notice of appeal to this court was filed on October 1, 2019. On October 2, 2019, the Commission moved to amend the judgment. The Amended Final Judgment was entered on November 27, 2019.

## II. POINTS OF ERROR

Akana's opening brief states nine points of error, which we have numbered as contemplated by Hawaiʻi Rules of Appellate Procedure (**HRAP**) Rule 28(b)(4) and restated to reflect the secondary nature of our review: **(1)** the Commission exceeded its jurisdiction by prosecuting Akana for discretionary conduct as an OHA trustee; **(2)** the Commission was not authorized to adopt the administrative rule under which Akana was charged; **(3)** the Commission deprived Akana of due process by issuing the Order Regarding Jurisdictional and Constitutional Issues without conducting an evidentiary hearing; **(4)** the Commission's selective prosecution of Akana violated her constitutional right to equal protection; **(5)** the fines imposed against Akana were excessive; **(6)** the Commission made erroneous findings of fact and wrong conclusions of law in applying the Fair Treatment Law to Akana's spending from her trustee allowance; **(7)** the Commission made erroneous findings and wrong conclusions in applying the Gifts Law and Gifts Reporting Law to a third party's payment of Akana's legal fees; **(8)** the circuit court abused its discretion by denying Akana's motion to stay enforcement of the Commission's Decision and Order; and **(9)** the circuit court erred by granting

the Commission's motion to amend the judgment after Akana filed her notice of appeal.

### III. STANDARDS OF REVIEW

#### A.    Administrative Agency Appeals

Our review of the circuit court's decision on Akana's appeal from the Commission's Decision and Order is a secondary appeal; we determine whether the circuit court was right or wrong, applying the standards in HRS § 91-14(g) to the Commission's decision based on the agency record.  Flores v. Bd. of Land & Nat. Res., 143 Hawai'i 114, 120, 424 P.3d 469, 475 (2018) (citation omitted).

HRS § 91-14(g) (Supp. 2018) provides:

> Upon review of the record, the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
>
> (1)    In violation of constitutional or statutory provisions;
>
> (2)    In excess of the statutory authority or jurisdiction of the agency;
>
> (3)    Made upon unlawful procedure;
>
> (4)    Affected by other error of law;
>
> (5)    Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
>
> (6)    Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

We review an agency's findings of fact for clear error. Del Monte Fresh Produce (Haw.), Inc. v. International Longshore and Warehouse Union, Local 142, 128 Hawai'i 289, 302, 287 P.3d 190, 203 (2012).  An agency's conclusions of law are usually reviewed de novo.  Id.  But when we review an agency's determination, we first examine whether the legislature granted

the agency discretion to make the determination being reviewed. If the legislature granted the agency discretion over a particular matter, we review the agency's action under the deferential abuse of discretion standard (remembering the legislature determines the boundaries of that discretion). Paul's Elec. Serv., Inc. v. Befitel, 104 Hawaiʻi 412, 419-20, 91 P.3d 494, 501-02 (2004).

The legislature granted the Commission discretion to administer and enforce HRS Chapter 84. See Boyd v. Haw. State Ethics Comm'n, 138 Hawaiʻi 218, 225, 378 P.3d 934, 941 (2016) (citing HRS Chapter 84, Preamble (1993));[4] HRS § 84-1 (2012) ("This chapter shall be liberally construed to promote high standards of ethical conduct in state government."). When we review the Commission's decision, we "cannot consider the weight of the evidence to ascertain whether it weighs in favor of the administrative findings, or review the agency's findings of fact by passing upon the credibility of witnesses or conflicts in testimony, especially the finding of an expert agency in dealing with a specialized field." Sierra Club v. D.R. Horton-Schuler Homes, LLC, 136 Hawaiʻi 505, 522, 364 P.3d 213, 230 (2015) (cleaned up).

## B.    Jurisdiction

An administrative agency may determine its own jurisdiction. See HOH Corp. v. Motor Vehicle Indus. Licensing Bd., 69 Haw. 135, 141, 736 P.2d 1271, 1275 (1987). The existence of jurisdiction is a question of law we review de novo under the

---

[4]    The Preamble states:

The purpose of this chapter is to (1) prescribe a code of ethics for elected officers and public employees of the State as mandated by the people of the State of Hawaii in the Hawaii constitution, article XIV; (2) educate the citizenry with respect to ethics in government; and (3) establish an ethics commission which will administer the codes of ethics adopted by the constitutional convention and by the legislature and render advisory opinions and enforce the provisions of this law so that public confidence in public servants will be preserved.

right/wrong standard.  In re Kanahele, 152 Hawaiʻi 501, 509, 526 P.3d 478, 486 (2023).

## C.    Statutory Interpretation

Interpretation of a statute is a question of law reviewed de novo.  Barker v. Young, 153 Hawaiʻi 144, 148, 528 P.3d 217, 221 (2023).  We start with the statute's language; "implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself."  Id. (citation omitted).

## IV. DISCUSSION

We discuss Akana's points of error in the order presented in her opening brief.

### A.    The Commission could investigate and take appropriate action against Akana for violating HRS Chapter 84.

Article XIV of the Hawaiʻi Constitution provides in relevant part:

> The people of Hawaii believe that public officers and employees must exhibit the highest standards of ethical conduct and that these standards come from the personal integrity of each individual in government.  To keep faith with this belief, the legislature, each political subdivision and the constitutional convention shall adopt a code of ethics which shall apply to appointed and elected officers and employees of the State or the political subdivision, respectively, including members of the boards, commissions and other bodies.
>
> Each code of ethics shall be administered by a separate ethics commission, except the code of ethics adopted by the constitutional convention which shall be administered by the state ethics commission.

The code of ethics applicable to state officers and employees, and members of state boards, commissions and other bodies, is HRS Chapter 84.  The Commission was established by HRS § 84-21 (2012).  It may "initiate, receive, and consider charges

concerning alleged violation of" HRS Chapter 84, and "initiate or make investigation, and hold hearings[.]" HRS § 84-31(a)(3) (2012). It has "jurisdiction for purposes of investigation and taking appropriate action on alleged violations of" HRS Chapter 84. HRS § 84-31(a)(6) (2012).

OHA was established by article XII, section 5 of the Hawaiʻi Constitution, see Arakaki v. Hawaii, 314 F.3d 1091, 1093 (9th Cir. 2002), and created by HRS § 10-4 (1979). It is governed by a nine-member board of trustees, elected by qualified voters in the state. Arakaki, 314 F.3d at 1093. Akana was an elected member of OHA's board of trustees. She is subject to the Code of Ethics, and the Commission had authority to investigate her alleged violations of the Gifts Law, the Gifts Reporting Law, and the Fair Treatment Law.

Akana argues she isn't subject to the Code of Ethics because it contradicts her obligations under HRS Chapter 10, the statute governing OHA. She cites Boyd, 138 Hawaiʻi 218, 378 P.3d 934. There, the supreme court held that the Commission did not have authority to adjudicate conflicts-of-interest proceedings under HRS § 84-14 against Boyd, a state charter school employee. Id. at 228, 378 P.3d at 944. The charter school statute in effect at the time of the alleged violations, HRS Chapter 302B,[5] exempted charter schools "from all other State laws in conflict with Chapter 302B." Id. at 227, 378 P.3d at 943 (citing HRS § 302B-9(a) (Supp. 2006 & 2007) (repealed 2012)). The Commission found Boyd in violation of HRS § 84-14 and fined him $10,000. Id. at 228 n.24, 378 P.3d at 944 n.24. The supreme court noted Boyd was fined "for the same conduct that was in compliance with [the charter school]'s conflict of interest policy, which was adopted in accordance with HRS §§ 302B-5(d)(6) or 302B-6(d)(6)." Id. The court held:

---

[5] HRS Chapter 302B was repealed in 2012 and replaced with HRS Chapter 302D. Boyd, 138 Hawaiʻi at 219 n.1, 378 P.3d at 935 n.1. Under HRS § 302D-12(i) (Supp. 2012), "[a]ll charter school employees and members of governing boards shall be subject to [HRS] chapter 84." Id. at 227 n.23, 378 P.3d at 943 n.23.

> If both HRS § 84-14 and Chapter 302B applied to a charter school employee during the relevant time period, then that employee would have been subject to two separate conflict of interest standards. Thus, that same employee could have been subject to punishment under one set of standards, but not the other, for the same conduct.

Id. at 228, 378 P.3d at 944.

Akana cites HRS §§ 10-4 ("Office of Hawaiian affairs; established; general powers") and 10-4.5 ("Authority over disbursements") as the statutes that "caused conflicting standards to be applied" to her conduct. "Two statutes conflict where it is not possible to give effect to both." Carmichael v. Bd. of Land & Nat. Res., 150 Hawaiʻi 547, 567, 506 P.3d 211, 231 (2022) (citation omitted). Nothing in HRS §§ 10-4 (2009) or 10-4.5 (2009) is contrary to, or inconsistent with, the Code of Ethics. See Off. of Hawaiian Affs. v. Kondo, 153 Hawaiʻi 170, 178, 528 P.3d 243, 251 (2023) (noting that "[g]enerally, two laws conflict when they 'are explicitly contrary to, or inconsistent with, each other.'" (quoting Boyd, 138 Hawaiʻi at 227, 378 P.3d at 943)). "[I]f laws can be interpreted harmoniously, there is no conflict." Id. OHA's Executive Policy Manual requires that "Trustees shall abide by the Standards of Conduct of the State of Hawaiʻi, Chapter 84, Hawaii Revised Statutes, as amended, and shall attend ethics training as required by law." Akana's argument lacks merit.

Akana also contends that the Commission erred because she "acted appropriately at all times in accordance with her fiduciary duties and capacity as trustee." She cites Kealoha v. Machado, 131 Hawaiʻi 62, 315 P.3d 213 (2013). The plaintiffs in Machado sued several OHA trustees (including Akana) for breaching their fiduciary duty by spending trust funds "without regard to blood quantum on lobbying efforts[.]" Id. at 71, 315 P.3d at 222. The supreme court noted that HRS Chapter 10 didn't mandate how OHA trustees should spend trust funds to better the conditions of native Hawaiians. Id. at 78, 315 P.3d at 229. "[T]he trustees have broad discretion in making that

8

determination."  Id. (citation omitted).  In that context, the
court held:

> When a trustee has discretion with respect to the
> exercise of a power, its exercise is subject to **supervision
> by a court** only to prevent abuse of discretion.  Where
> discretionary power is given to the trustee, the court will
> not interfere unless the trustee in exercising or failing to
> exercise the power acts dishonestly, or with an improper
> even though not a dishonest motive, or fails to use his
> judgment, or acts beyond the bounds of a reasonable
> judgment.

Id. at 77, 315 P.3d at 228 (cleaned up) (emphasis added).

Akana argues that a court can only review her conduct
for breach of fiduciary duty, and "cannot interfere with an OHA
trustee's exercise of discretionary power without first making a
finding of breach of fiduciary duty."  She argues that the
circuit court improperly interfered by affirming the Decision and
Order because neither the Commission nor the circuit court found
that she abused her discretionary power.  But neither the
Commission nor the circuit court were tasked with determining
whether Akana breached her fiduciary duty to OHA beneficiaries.
They reviewed whether Akana met her obligations under the Code of
Ethics, not whether she breached her fiduciary duty as an OHA
trustee.  Nothing in Machado constrains the Commission from
investigating alleged violations of the Code of Ethics, or from
taking appropriate action on violations.

Akana argues for reversal of the Commission's findings
that she violated the Fair Treatment Law because "each and every
expenditure [she] made . . . went through the approval process
created by OHA and was either authorized, or was disallowed and
then reimbursed by Ms. Akana in accordance with OHA policy."
That, she contends, resulted "in inconsistent and conflicting
standards being applied."  But OHA does not pre-authorize trustee
spending.  The Commission found, and Akana does not challenge:

> 79.  Because Trustees are provided with Trustee Annual
>       Allowance funds in a lump sum at the beginning of the
>       fiscal year, the OHA fiscal staff's review of a
>       Trustee's quarterly report is an "after-the-fact"

review; by the time the fiscal staff receives a quarterly report from a Trustee, the expenditures listed in the report have already been made by the Trustee.

. . . .

82. The quarterly and year-end reviews of Trustee Annual Allowance expenditures are a "tedious" and "time-consuming" process, inasmuch as OHA fiscal staff reviews each expenditure manually and it is not possible for staff to catch all disallowed expenditures, primarily because each Trustee is allowed to spend $22,200 annually, which includes many small expenditures.

. . . .

86. The fact that a particular expense is "not disallowed" by OHA fiscal staff does not mean that the expenditure is "allowable" or consistent with OHA policy; it could simply mean that the expense was not "flagged" by the fiscal staff. As stated by former Controller Kim in his testimony, the failure to disallow a prohibited expense was a deficiency in the process of reviewing these expenditures; however, the fact that an expenditure was not disallowed does not necessarily mean that the expenditure was allowable pursuant to OHA policy.

. . . .

91. The Commission finds, based upon credible evidence, that Respondent Akana threatened and berated OHA fiscal staff who questioned or disallowed her Trustee Annual Allowance expenditures. Current and former OHA staff members testified that they and their colleagues feared personal attacks or possible retaliation when questioning Respondent Akana about her expenditures.

92. OHA fiscal staff found that trying to get additional information and documentation from Respondent Akana about her expenditures was difficult and the staff was intimidated to ask Respondent Akana for information "because they don't want to get yelled at."

. . . .

96. There were many incidents that affected how [former OHA Chief Financial Officer (**CFO**)] Ms. Iona approached Respondent Akana with respect to her Trustee Allowance expenditures:

> [I]t really all boils down to there was an effort by administration to enforce policies and procedures the best that we could. There was disagreement from trustee Rowena Akana in doing so, and that, in itself would cause a lot of personal attacks against members of the administration, including myself. And that was really the standard in really the almost six years that I was the CFO.

97. Because of Respondent Akana's threats to and intimidation of OHA fiscal staff, more than one OHA employee was reluctant to challenge Respondent Akana regarding her spending of Trustee Annual Allowance funds.

98. In January 2014, then-CFO Iona decided not to question Respondent Akana about the purchase of a $50 iTunes gift card (Count 7, discussed at FOFs # 99-104, below) — even though Ms. Iona believed the purchase should not have been allowed — expressly because Ms. Iona did not want to upset Respondent Akana.

(Citations to evidence omitted.)  These unchallenged findings bind Akana.  See Poe, 97 Hawaiʻi at 536, 40 P.3d at 938.  Akana's argument that she could not have violated the Code of Ethics because her spending was not disallowed by OHA lacks merit.

B.    **The Commission was authorized to adopt the administrative rule under which Akana was charged.**

The charges against Akana were brought under Hawaii Administrative Rules (**HAR**) § 21-5-2 (eff. 1981).  Akana contends that HAR § 21-5-2 exceeds the statutory authority granted to the Commission.  The rule provided:

(a)   Upon the receipt of anonymous information or other information not under oath, or information obtained at the initiative of the commission, the executive director or delegate shall verify such facts as may be verified through public documents or the assistance of department heads, legislators, or other appointed or elected officials or employees, including the respondent.  Investigation may not extend to interviews of other persons unless the commission, in its discretion, initiates an investigation to determine whether a charge should be issued.  This investigation will be carried out confidentially by the executive director or delegate.  The nature and scope of the investigation shall be defined by a resolution supported by a vote of three or more members of the commission.

(b)   If after preliminary investigation at least three commissioners decide that a charge should be initiated, the charge shall be issued in writing and signed by at least three commissioners.

Akana argues that the Commission "may only investigate a matter *after* the issuance of written charges."  Her argument lacks merit.  HRS § 84-31(a)(3) empowers the Commission to "initiate, receive, and consider charges concerning alleged

violation of this chapter, *initiate or make investigation*, and hold hearings[.]"  (Emphasis added.)  HAR § 21-5-2 follows the Commission's statutory authority to "initiate or make investigation" into violations of the Code of Ethics.

### C.    Akana was not deprived of due process.

Akana contends that she "was denied due process in so far as she was not given an evidentiary hearing to contest the Commission's authority and jurisdiction to bring charges against her in the first place."  The record does not show that Akana asked for an evidentiary hearing to determine the Commission's jurisdiction, either before or after entry of the Order Regarding Jurisdictional and Constitutional Issues.  We decline to consider this argument, made for the first time on appeal.  See State v. Moses, 102 Hawaiʻi 449, 456, 77 P.3d 940, 947 (2003) ("As a general rule, if a party does not raise an argument at trial, that argument will be deemed to have been waived on appeal; this rule applies in both criminal and civil cases." (citations omitted)).

At any rate, the purpose of an evidentiary hearing is to resolve factual disputes.  Safeway, Inc. v. Nordic PCL Constr., Inc., 130 Hawaiʻi 517, 531–32, 312 P.3d 1224, 1238–39 (App. 2013).  There were no genuine factual issues material to the Commission's authority and jurisdiction to determine whether Akana violated the Code of Ethics.  Akana did not dispute she was an elected, salaried member of OHA's board of trustees.  As an OHA trustee, she is subject to the Code of Ethics as a matter of law.  The Commission could investigate her alleged violations of the Gifts Law, the Gifts Reporting Law, and the Fair Treatment Law, and take appropriate action.  See HRS § 84-31(a)(3).

### D.    The Commission did not violate Akana's constitutional right to equal protection.

Akana contends she was selectively prosecuted in violation of her right to equal protection under article I,

section 5 of the Hawaiʻi Constitution.  She must "present sufficient evidence to establish the existence of intentional or purposeful discrimination . . . that is deliberately based upon an unjustifiable standard such as race, religion or other arbitrary classification."  State v. Kailua Auto Wreckers, Inc., 62 Haw. 222, 226-27, 615 P.2d 730, 734-35 (1980) (cleaned up).  Akana's briefs don't cite to any evidence presented to the Commission that supports her selective prosecution defense.

Akana argues that she tried to present this evidence to the circuit court, but the court denied her motion to present new evidence.  Her motion cited HRS § 91-14(e) (2012), which lets the circuit court order that new evidence be presented to the agency, which may then change its findings, decision, and order.  Akana's motion sought to present new evidence "to this [Circuit] Court on appeal."  This procedure is not allowed by HRS § 91-14(e).  See also HRS § 91-14(f) (Supp. 2018) ("The review shall be . . . confined to the record[.]").  The circuit court did not err by denying Akana's motion.

In this secondary appeal, Akana argues that the new evidence she sought to present (to the circuit court) would have shown that the Commission "had no rational basis to proceed solely against Ms. Akana for the exact same types of transactions made by other OHA trustees during the same time period, and therefore the Commission's prosecution was unlawful and violated Ms. Akana's equal protection rights."  "It is insufficient to show merely that other offenders have not been prosecuted[.]"  Kailua Auto Wreckers, 62 Haw. at 227, 615 P.2d at 735 (citation omitted).  Akana makes a conclusory argument that "a group of OHA trustees and members of the OHA Board who were politically opposed to" her persuaded the Commission to "bring a retaliatory action against" her.  She presented no such evidence to the Commission.  Akana's contention of selective prosecution lacks merit.

**E.    The fines imposed were not unconstitutionally excessive.**

The Commission fined Akana $23,106.52 for 47 violations of the Code of Ethics.  Akana argues that "a $1,000.00 fine, or *any fine at all beyond a nominal one,* is excessive" because her spending violations "were either approved by OHA itself or else promptly reimbursed to OHA in accordance with internal OHA protocols."  We've already dismissed Akana's argument that she could not have violated the Code of Ethics because her spending was "authorized" or "not disallowed" by OHA.

The Commission found and concluded:

**IV.    <u>ADMINISTRATIVE FINE</u>**

. . . .

5.    The Commission concludes that Respondent Akana's failure to report gifts totaling more than $50,000 from Ms. [Abigail] Kawananakoa constituted violations of the State Ethics Code, and that each violation warrants the maximum administrative fine of $500 applicable at the time the offenses occurred.

6.    The Commission concludes that Respondent Akana's receipt of gifts totaling more than $21,000 from Ms. Kawananakoa on or about April 28, 2017 and June 17, 2017 constituted violations of the State Ethics Code, and that each violation warrants the maximum administrative fine of $500 applicable at the time the offense occurred.

7.    The Commission concludes that Respondent Akana's expenditure of her Trustee Annual Allowance for her Hawaiian Airlines Premier Club membership, political contributions — including the political action committee event — and home cable television service constituted violations of the State Ethics Code, and that each violation warrants the maximum administrative fine applicable at the time the offense occurred.

8.    Regarding Respondent Akana's expenditures on food: the Commission concludes that it is proper for Respondent Akana to pay an administrative fine equivalent to the amount of each expenditure, essentially requiring Respondent Akana to use personal funds to pay for these expenditures.  The Commission has taken this approach in similar cases.  Regarding Respondent Akana's expenditure for food for OHA Trustees' holiday party (Count 48) — an expenditure that was disallowed by OHA, such that Respondent Akana eventually used personal funds to pay for the expenditure — no administrative fine will be imposed.

14

9.  Upon consideration of the evidence and the arguments of counsel, the Hawaii State Ethics Commission hereby determines and concludes that the following administrative fines for each of the violations of HRS chapter 84 that occurred are appropriate and shall be assessed:

    a.  Counts 1-4 (Failure to Report Gifts): $500 each ($2,000 total)

    b.  Counts 5-6 (Improper Acceptance of Gifts): $500 each ($1,000 total)

    c.  Counts [sic] 8 (Expenditures [sic] - Premier Club): $500

    d.  Counts 10, 12-28 (Expenditures - Cable Television): $500 each ($9,000 total)

    e.  Counts 29-36 (Expenditures - Cable Television): $1,000 each ($8,000 total)

    f.  Count 38 (Expenditure - Food): $17.80

    g.  Count 39 (Expenditure - Food): $268.59

    h.  Count 40 (Expenditure - Food): $31.94

    i.  Count 41 (Expenditure - Food): $61.83

    j.  Count 42 (Expenditure - Food): $66.49

    k.  Count 43 (Expenditure - Food): $39.48

    l.  Count 44 (Expenditure - Food): $31.01

    m.  Count 45 (Expenditure - Food): $20.73

    n.  Count 46 (Expenditure - Food): $43.66

    o.  Count 47 (Expenditure - Food): $25.00

    p.  Count 48 (Expenditure - Food): $0.00
        This expenditure was disallowed by OHA.

    q.  Counts 49-50 (Expenditures - Political Contributions): $500 each ($1,000 total)

    r.  Count 51 (Expenditure - Contribution PAC Event): $1,000

10. Contrary to Respondent Akana's assertion that any administrative penalties assessed against her would be excessive, the Commission finds that the maximum administrative penalties imposed above are appropriate in light of the breadth and egregious nature of Respondent Akana's conduct.  The evidence established that Respondent Akana committed dozens of violations of the State Ethics Code by accepting illegal gifts valued at over $21,000; failing to timely report gifts valued at over $50,000; and using Trustee Annual

15

Allowance funds for her own personal benefit or for political contributions.

11. The administrative penalties imposed above are appropriate given the especially troubling actions of the Respondent with respect to the use of her Trustee Annual Allowance. Because OHA staff who administered the Trustee Annual Allowance were fearful of personal attacks and threats for questioning Respondent's expenditures, it cannot be said that any expenditure that was "not disallowed" complied with OHA's own policies. Indeed, Respondent Akana seemingly displayed a "pattern of consistently trying to get away with spending that a prudent person would not otherwise be able to push that boundary."

(Citations omitted.)

Akana argues that her "belated reporting of 'gifts' of legal fees" was "purely a technical violation." The Commission addressed that issue:

### III. CONCLUSIONS OF LAW

. . . .

76. The Commission disagrees that Respondent Akana's failure to report four gifts (amounting to over $50,000) from Ms. Kawananakoa is a "technical" violation warranting only a "nominal penalty per instance" or that "any fine at all[] is excessive when considering the nature of the alleged violations[.]"

77. Respondent Akana's failure to report the gifts that she received from Ms. Kawananakoa are not mere "technical" violations. Gifts [sic] disclosures serve the vital purposes of government transparency and accountability. They provide the Commission and the public with information needed to hold government employees to the highest ethical standards. As reflected in the legislative history of HRS § 84-11.5, gifts [sic] disclosures may be a slight inconvenience for filers, but they are <u>necessary</u> to promote public confidence in government and in public officials.

78. Had Respondent timely filed her gifts disclosure statements by the June 30, 2016 deadline, the Commission and the public would have had this information a year earlier. Calling this a "technical" violation entirely misses the point of the Gifts Reporting law.

. . . .

81. The Commission concludes that the maximum fine of $500 per violation (Counts 1-4) applicable at the time of Respondent Akana's misconduct is consistent with applicable law and appropriate.

16

(Citations omitted.)

The Commission's fine of $500 for each violation was authorized by HRS § 84-39 (2012).[6]  Akana has not challenged the constitutionality of that statute.  The Commission's characterization of Akana's conduct was supported by substantial evidence and was not clearly erroneous.  Given the record here, we cannot say the Commission abused its discretion by imposing the maximum administrative fines allowed under HRS § 84-39 (2012).

**F.    The Commission's findings and conclusions about Akana's spending were supported by substantial evidence and were neither clearly erroneous nor wrong.**

OHA trustees receive their allowance as a lump sum at the beginning of each fiscal year.  OHA's Board of Trustees sets policies for the trustees' use of their allowance.  OHA's Executive Policy Manual states that the allowance is "not intended to be used for personal gain by a Trustee[.]" (Underscoring omitted.)  OHA's Trustee Scholarship and Annual Allowance Fund (**TSAAF**) Handbook states that political contributions are not allowed.  Trustees must submit quarterly spending reports; OHA's controller reconciles the reports and works with the trustees to clear any discrepancies.  At the end of the fiscal year, any unspent allowance must be returned to OHA.  If OHA disallows a trustee's spending, the amount is added to what that trustee must repay to OHA at the end of the fiscal year.  The quarterly and fiscal-year-end reviews are tedious and time-consuming because OHA staff manually review each expenditure, many of which are small in amount, and it is impossible to catch all improper spending.  Thus, a particular expense not being disallowed does not mean it was a proper use of the trustee's allowance.

_____

[6]    HRS § 84-39 was amended in 2017 to increase the maximum administrative fine to $1,000 per violation.  2017 Haw. Sess. Laws Act 50, § 1 at 305.

The Fair Treatment Law provided, in relevant part:

> No . . . employee shall use or attempt to use the . . . employee's official position to secure or grant **unwarranted privileges**, exemptions, advantages, contracts, or treatment, for [the employee] or others[.]

HRS § 84-13 (2012) (emphasis added).

Akana argues that the Commission applied the wrong standard to determine what constituted "unwarranted" privileges. She contends she may use her trustee allowance in ways she felt would help OHA or its beneficiaries. She conflates her fiduciary duty as an OHA trustee with her obligations under the Code of Ethics. She again cites Kealoha v. Machado, 131 Hawaiʻi 62, 315 P.3d 213 (2013). As we previously stated, Machado does not constrain the Commission from investigating alleged violations of the Code of Ethics by OHA trustees, or from taking appropriate action on violations.

**1. Hawaiian Airlines Premier Club Membership.** Akana challenges the Commission's decision on Count 8, which charged:

> 53.    Respondent AKANA, by using Trustee Annual Allowance funds to purchase a Premier Club membership with Hawaiian Airlines costing $249.00, used or attempted to use her official position to secure an unwarranted personal benefit for herself, in violation of HRS § 84-13 (COUNT 8).

Akana argues she believed her purchase "was in the best interests of the OHA beneficiaries" because it "would save money for the trust over time[.]" She also argues that she paid the $249 back after OHA disallowed the expense. She does not challenge these findings and conclusions:

> **II.    FINDINGS OF FACT**
>
> . . . .
>
> 105.    On or about July 15, 2014, Respondent Akana used $249 of Trustee Annual Allowance funds to purchase a Hawaiian Airlines Premier Club membership (hereinafter "Premier Club membership").
>
> 106.    Benefits of the Premier Club membership included access to Hawaiian Airlines' airport Premier Clubs,

18

priority check-in and boarding, complimentary "Unlimited TV & More Pack" on certain flights to and from the mainland, and two free checked bags.

107. OHA had allowed Trustees to purchase Premier Club memberships in the past, but a former [Board of Trustees (**BOT**)] Chair stopped the practice before Respondent Akana purchased her Premier Club membership in 2014.

. . . .

110. Respondent Akana claimed that she saved OHA money by paying for her Premier Club membership.

111. At the hearing, Respondent's attorney argued that Respondent Akana saved money by paying for her Premier Club membership rather than paying baggage fees for three or four bags each way.

112. OHA's corporate account with Hawaiian Airlines permitted each OHA traveler — including OHA Trustees — to take one free checked bag.

113. The Premier Club membership permitted two free checked bags - only one more free bag than already allowed by OHA's corporate account with Hawaiian Airlines.

. . . .

115. Notwithstanding her knowledge that OHA's policy regarding Premiere [sic] Club membership had changed, Respondent Akana never consulted with the OHA fiscal office about her purchase of a Premier Club membership for herself.

. . . .

III. **CONCLUSIONS OF LAW**

. . . .

102. Respondent Akana purchased the Premier Club membership knowing that it was disallowed. She informed the Commission that she was aware that the practice of Trustees being allowed to purchase this membership had previously ended under a prior BOT Chairperson. Even though this expenditure was disallowed by OHA, such that Respondent Akana eventually used personal funds to reimburse OHA for this purchase, she expended Trustee Annual Allowance funds on this purchase and submitted a quarterly report to OHA in which she sought to have this purchase offset against her Trustee Annual Allowance balance.

(Citations to evidence omitted.)

Akana challenges these findings and conclusions:

**II.    FINDINGS OF FACT**

. . . .

116.    The Commission finds that Respondent Akana used or attempted to use her Trustee Annual Allowance for her personal benefit by purchasing a Premier Club membership for herself.

. . . .

**III.   CONCLUSIONS OF LAW**

. . . .

101.    Although Respondent Akana maintains that she purchased the Hawaiian Airlines Premier Club membership to save money on baggage fees, Respondent Akana was already entitled to one free bag when she traveled on Hawaiian Airlines through OHA's corporate account.  The Premier Club membership allowed Respondent Akana to enjoy the other personal benefits of membership — such as access to the airline's club lounge and complimentary "Unlimited TV & More Pack" on certain flights — conferring an unwarranted benefit upon her.

These findings and conclusions are supported by substantial evidence in the record and by the Commission's unchallenged findings, and reflect an application of the correct rule of law. The Commission did not abuse its discretion on this issue.

**2.    Cable Television Bills.**  Akana challenges the Commission's decisions on Counts 10 and 12-36, which charged:

56.    Respondent AKANA, by using Trustee Annual Allowance funds to pay the total amount of Oceanic's monthly bill for the Surf Pak Xtra package on or about each of the dates listed below, where the approximate monthly cost of the type of internet service she used was under $50.00, used or attempted to use her official position to secure unwarranted personal benefits for herself — that is, home cable television service — in violation of HRS § 84-13:

a.    November 20, 2015 ($127.90) (COUNT 10);

. . . .

c.    January 22, 2016 ($127.90) (COUNT 12);

d.    February 15, 2016 ($135.78) (COUNT 13);

e.    March 5, 2016 ($132.43) (COUNT 14);

f.    April 10, 2016 ($134.37) (COUNT 15);

g. May 9, 2016 ($133.55) (COUNT 16);

h. June 6, 2016 ($133.55) (COUNT 17);

i. June 30, 2016 ($133.55) (COUNT 18);

j. August 8, 2016 ($133.55) (COUNT 19);

k. September 5, 2016 ($133.55) (COUNT 20);

l. October 22, 2016, ($136.83) (COUNT 21); and

m. November 24, 2016 ($136.83) (COUNT 22).

. . . .

59.    Respondent AKANA, by using Trustee Annual Allowance funds of $80.00 or $82.00 on or about each of the dates listed below to pay a portion of Oceanic's or Spectrum's total monthly bill for the Surf Pak Xtra package, purportedly, for home internet service, when the approximate monthly cost of the type of internet service she used was under $50.00, used Trustee Annual Allowance funds to partly pay for home cable television service. Respondent AKANA's actions constituted the use or attempted use of her official position to secure unwarranted personal benefits for herself — that is, home cable television service — in violation of HRS § 84-13:

a. December 21, 2016 (used $80.00 to pay Oceanic) (COUNT 23);

b. January 20, 2017 (used $80.00 to pay Oceanic) (COUNT 24);

c. February 13, 2017 (used $80.00 to pay Oceanic) (COUNT 25);

d. March 15, 2017 (used $80.00 to pay Oceanic) (COUNT 26);

e. April 20, 2017 (used $80.00 to pay Oceanic) (COUNT 27);

f. May 20, 2017 (used $80.00 to pay Oceanic) (COUNT 28);

g. June 25, 2017 (used $80.00 to pay Oceanic) (COUNT 29);

h. July 21, 2017 (used $80.00 to pay Spectrum) (COUNT 30);

i. August 24, 2017 (used $80.00 to pay Spectrum) (COUNT 31);

j. September 10, 2017 (used $82.00 to pay Spectrum) (COUNT 32);

k. October 10, 2017 (used $80.00 to pay Spectrum) (COUNT 33);

21

> l. November 20, 2017 (used $80.00 to pay Spectrum) (COUNT 34);
>
> m. December 13, 2017 (used $80.00 to pay Spectrum) (COUNT 35); and
>
> n. December 30, 2017 (used $80.00 to pay Spectrum) (COUNT 36).

Akana argues she "made proper discretionary decisions to spend monies on OHA-related communications and to gain a broader understanding of Hawaiian issues for in [sic] her role as an OHA Trustee via watching CNN, Olelo and other news programs."

Akana does not challenge these findings:

> 117. In 2015 to 2017, Respondent Akana subscribed to a home cable television and internet bundled service package called "Surf Pak Xtra," offered by Oceanic Time Warner Cable ("Oceanic"), a company that was rebranded as "Spectrum" in or around 2017.
>
> 118. The Surf Pak Xtra package consisted of standard television service as well as access to additional channels, and "Extreme Internet" service.
>
> 119. In 2015 and 2016, Respondent Akana used Trustee Annual Allowance funds to pay the entire amount of her monthly bills from Oceanic for the Surf Pak Xtra package.
>
> . . . .
>
> 124. Respondent Akana used her Trustee Annual Allowance to pay the entire amount of her monthly Oceanic cable bill on or about the following dates, without reimbursing OHA or the Trustee Annual Allowance fund for the portion related to her home cable television service:
>
> a. November 20, 2015 ($127.90) (Count 10).
>
> b. January 22, 2016 ($127.90) (Count 12).
>
> c. February 15, 2016 ($135.78) (Count 13).
>
> d. March 5, 2016 ($132.43) (Count 14).
>
> e. April 10, 2016 ($134.37) (Count 15).
>
> f. May 9, 2016 ($133.55) (Count 16).
>
> g. June 6, 2016 ($133.55) (Count 17).
>
> h. June 30, 2016 ($133.55) (Count 18).
>
> . . . .

130. On August 8, 2016, Respondent Akana used Trustee Annual Allowance funds to pay for her entire Oceanic cable bill ($133.55) (Count 19).

131. On September 5, 2016, Respondent Akana used Trustee Annual Allowance funds to pay for her entire Oceanic cable bill ($133.55) (Count 20).

132. Respondent Akana submitted her quarterly report for July 1, 2016 - September 30, 2016 on October 7, 2016; Respondent Akana's quarterly report included the August 8, 2016 and September 5, 2016 payments to Oceanic.

. . . .

134. [OHA] CEO [Kamanaʻopono] Crabbe's [October 17, 2016] memorandum explained: "Standard TV, Digital Variety Pak, 2-Way Addressable Box is not considered communications to constituents. Only internet is allowed under the TSAAF. Based on inquiry with Oceanic customer service the breakdown of internet charge is $47.89 (Internet $42.07 + Olelo Capital Funding $0.26 + Cable franchise fee $3.58 + State GET $1.98)."

135. OHA fiscal staff determined that OHA policy only allowed Respondent Akana to use her Trustee Annual Allowance to pay $47.89 for her monthly home internet service from Oceanic.

136. The portion of the Oceanic bill not attributable to Respondent Akana's home internet service was disallowed by OHA fiscal staff because those Oceanic services were for the personal benefit of Respondent Akana.

. . . .

148. On or about October 22, 2016 and November 24, 2016, Respondent Akana made payments of $136.83 — the full amount of her monthly bill for the Surf Pak Xtra package, including her home cable television service — to Oceanic (Counts 21 and 22).

149. The checks for these expenditures were drawn from the same bank account as Respondent's previous expenditures to pay for her Oceanic cable bills.

150. On the memo line of the check pertaining to the November 24, 2016 expenditure is a handwritten note that says "allowable."

151. Despite receiving notification from CEO Crabbe on October 17, 2016 and November 21, 2016 that expenditures on cable television service would be disallowed and that internet service could be claimed at only $47.89, Respondent Akana claimed $80.00 of Trustee Annual Allowance funds when she submitted her quarterly report for the October 2016 and November 2016 expenditures.

152. Respondent Akana was charged with using her Trustee Annual Allowance to pay the entire amount ($136.83) of her Oceanic cable bills on October 22, 2016 (Count 21) and November 24, 2016. (Count 22). Respondent Akana appears to have initially paid for the entire amount of both bills with funds from a checking account used by Respondent for her previous Trustee Annual Allowance expenditures. However, at a later date, Respondent Akana claimed $80 of Trustee Annual Allowance funds for each of those payments.

153. Although Respondent used her Trustee Annual Allowance to pay $80 and not $136.83 to Oceanic on October 22, 2016 (Count 21) and November 24, 2016 (Count 22), this amount was still more than Respondent was allowed to claim for her home internet service.

154. On or about December 21, 2016, Respondent Akana again used Trustee Annual Allowance funds to pay $80.00 to Oceanic (Count 23).

. . . .

160. In documentation attached with the December 21, 2016 Oceanic expenditure (Count 23), there appears to be a printout of a screen shot of the Oceanic website listing three options for internet service: "Extreme" Internet - 100/10 Mbps - for $29.95 a month, "Ultimate 200" Internet - 200/20 Mbps - for $39.99 a month; and "Ultimate 300" Internet - 300/20 Mbps - for $59.99 a month.

161. Just below this screen shot appears a handwritten note:

        4/5/17        $59.99 monthly rate
                     +$10.00 modem lease
                     +$10.00 estimated taxes
                      $79.99

162. This handwritten note provides the only possible basis on which Respondent Akana may have determined that she could use $80 a month of Trustee Annual Allowance funds (rather than $47.89 a month) for her home internet service. However, as set forth above, Complainant introduced competent and substantial evidence that the cost of home internet service was less than $50 a month, and Respondent Akana did not present any evidence to contradict Complainant's evidence.

163. Moreover, this screenshot and handwritten note below the screenshot do not support Respondent Akana's claims for $80.00 a month for home internet service. As part of the Surf Pak Xtra package, Respondent Akana received "Extreme Internet" — the lowest level of internet service, offered at $29.95 a month. Thus, if Respondent Akana was, in fact, using $59.99 a month as a baseline for her home internet service, it would mean she was using an artificially high baseline — the most expensive internet service ("Ultimate 300" at $59.99 a month), rather than the less expensive

24

service she was actually receiving ("Extreme" at $29.95 a month).

. . . .

166. Between January 2017 and December 2017, Respondent Akana continued to use Trustee Annual Allowance funds to pay approximately $80 — for her home internet service and to subsidize her home cable television service, without reimbursing OHA or the Trustee Annual Allowance fund for such expenditures:

a.    January 20, 2017 ($80) (Count 24).

b.    February 13, 2017 ($80) (Count 25).

c.    March 15, 2017 ($80) (Count 26).

d.    April 20, 20017 [sic] ($80) (Count 27).

e.    May 20, 2017 ($80) (Count 28).

f.    June 25, 2017 ($80) (Count 29).

g.    July 21, 2017 ($80) (Count 30).

h.    August 24, 2017 ($80) (Count 31).

i.    September 10, 2017 ($82) (Count 32).

j.    October 10, 2017 ($80) (Count 33).

k.    November 20, 2017 ($80) (Count 34).

1.    December 13, 2017 ($80) (Count 35).

m.    December 30, 2017 ($80) (Count 36).

(Footnotes and citations to evidence omitted.)

Akana challenges these findings and conclusions:

**II.    FINDINGS OF FACT**

. . . .

120. OHA policy (stated in the 2013 Amendment to the Executive Policy Manual) allowed Trustee Annual Allowance funds to be used for expenses for communications with constituents. Thus, internet service was an allowed expense. However, the policy did not provide for home cable television service as an allowable expense.

121. The Commission finds that Respondent Akana's testimony that she very rarely watched television or mostly watched Olelo or the news is not a sufficient justification to use her Trustee Annual Allowance to pay for her home cable television service. Instead, the Commission finds that Respondent Akana's home cable television service was a personal benefit to Respondent.

25

122. Respondent Akana's use of Trustee Annual Allowance funds to pay the entire amount of her monthly Oceanic bill was not allowable under OHA policy because the Oceanic bill included charges for home cable television service, which was a personal benefit to her.

. . . .

125. For each of the transactions listed above (relating to Count 10 and Counts 12-18), the Commission finds that Respondent Akana used her Trustee Annual Allowance for her personal benefit by paying for her home cable television service.

. . . .

147. For the August 8, 2016 and September 5, 2016 transactions (relating to Counts 19 and 20), the Commission finds that Respondent Akana used or attempted to use her Trustee Annual Allowance for her personal benefit by paying for her home cable television service.

. . . .

164. As such, in each of the months in which Respondent used more than $47.89 of Trustee Annual Allowance funds to pay her Oceanic bill, the Commission finds that Respondent was using Trustee Annual Allowance funds to subsidize her purchase of home cable television service — despite previously being informed by OHA staff that she was allowed to claim only $47.89 for internet service. Thus, she received an unwarranted benefit of approximately $32.11 per month ($80.00 - $47.89).

165. By using $80.00 a month of Trustee Annual Allowance funds to pay her Oceanic bill, Respondent Akana also failed to comply with the directive from CEO Crabbe that Trustee Annual Allowance funds not be used for home cable television service.

. . . .

167. For each of the transactions listed above (relating to Counts 21-36), the Commission finds that Respondent Akana used her Trustee Annual Allowance for her own personal benefit by subsidizing her payments for her home cable television service.

. . . .

**III. CONCLUSIONS OF LAW**

. . . .

106. Respondent Akana used or attempted to use her official position to secure unwarranted personal benefits for herself — that is, home cable television service — in violation of HRS § 84-13 by paying for or attempting to pay for all or some of the monthly charges for

Respondent's home cable television service with Trustee Annual Allowance funds on or about each of the dates listed below:

a.   November 20, 2015 (Count 10);

b.   January 22, 2016 (Count 12);

c.   February 15, 2016 (Count 13);

d.   March 5, 2016 (Count 14);

e.   April 10, 2016 (Count 15);

f.   May 9, 2016 (Count 16);

g.   June 6, 2016 (Count 17);

h.   June 30, 2016 (Count 18);

i.   August 8, 2016 (Count 19);

j.   September 5, 2016 (Count 20);

k.   October 22, 2016 (Count 21);

1.   November 24, 2016 (Count 22);

m.   December 21, 2016 (Count 23);

n.   January 20, 2017 (Count 24);

o.   February 13, 2017 (Count 25);

p.   March 15, 2017 (Count 26);

q.   April 20, 2017 (Count 27);

r.   May 20, 2017 (Count 28);

s.   June 25, 2017 (Count 29);

t.   July 21, 2017 (Count 30);

u.   August 24, 2017 (Count 31);

v.   September 10, 2017 (Count 32);

w.   October 10, 2017 (Count 33);

x.   November 20, 2017 (Count 34);

y.   December 13, 2017 (Count 35); and

z.   December 30, 2017 (Count 36).

107.   Even though the August 8, 2016 (Count 19) and September 5, 2016 (Count 20) expenditures were disallowed in part by OHA, such that Respondent Akana eventually used personal funds to pay for a portion of these purchases, Respondent submitted a quarterly report to OHA in which she sought to have these

purchases offset against her Trustee Annual Allowance balance. Her attempts to use Trustee Annual Allowance funds to confer a personal benefit upon herself are violations of the Fair Treatment Law.

108. Each expenditure made by Respondent Akana out of the Trustee Annual Allowance for home television service constitutes a separate violation of HRS § 84-13.

109. There is no evidence to suggest that Respondent Akana reimbursed OHA or the Trustee Annual Allowance fund for any of these purchases of home cable television service, other than her eventual use of personal funds to pay for a portion of the August 2016 and September 2016 purchases. However, even if Respondent Akana had reimbursed OHA or the Trustee Annual Allowance fund, each attempt by Respondent Akana to use her official position to make the above-referenced purchases of home cable television service using Trustee Annual Allowance funds constitutes a violation of HRS § 84-13.

110. The Commission concludes that the violations in Counts 21-36 are especially troubling. Respondent Akana continued to claim $80 for reimbursement for internet service even after being informed by OHA staff that she was only allowed to claim $47.89. In other words, Respondent Akana dishonestly continued to claim $80 for internet service knowing that she was not entitled to reimbursement from her Trustee Allowance for this amount.

(Citations to evidence omitted.)

The Commission's findings and mixed findings and conclusions are supported by substantial evidence in the record, including testimony by OHA's controller Gloria Li, OHA's former chief financial officer Hawley Iona, and OHA's former controller John Kim, all of whom the Commission found to be credible. They are also supported by the Commission's unchallenged findings. They were not clearly erroneous, and reflect an application of the correct rule of law. They will not be overturned. See Est. of Klink ex rel. Klink v. State, 113 Hawai'i 332, 351, 152 P.3d 504, 523 (2007). The Commission did not abuse its discretion in deciding that Akana using her trustee allowance to pay for her home cable television service was an unwarranted privilege.

**3. Food Purchases.** Akana challenges the Commission's decisions on Counts 38 through 48, which charged:

62.     Respondent AKANA, by using Trustee Annual Allowance funds on or about each of the following dates, for the purposes and in the amounts stated below, to pay for food or meals for her [sic] herself and/or OHA Trustees and/or OHA staff, used or attempted to use her official position to secure unwarranted personal benefits for OHA personnel, including herself, in violation of HRS § 84-13:

. . . .

b.      March 17, 2014, refreshments for staff, from Leonard's Bakery, $17.80 (COUNT 38);

c.      July 3, 2014, food for a "going away party" for a staff member, from 1132 Cafe & Catering, $268.59 (COUNT 39);

d.      August 4, 2014, breakfast for staff, from Liliha Bakery, $31.94 (COUNT 40);

e.      February 10, 2015, food for a staff "birthday celebration," from Zippy's Nimitz, $61.83 (COUNT 41);

f.      January 23, 2015, manapua for staff, from Royal Kitchen, $66.49 (COUNT 42);

g.      July 9, 2015, food for a staff meeting, from Liliha Bakery, $39.48 (COUNT 43);

h.      December 2, 2015, food for staff from Chinatown Express Ala Moana, $31.01 (COUNT 44);

i.      August 15, 2016, refreshments for staff from Leonard's Bakery, $20.73 (COUNT 45);

j.      October 5, 2016, lunch for staff from Tanaka Saimin, $43.66 (COUNT 46);

k.      February 17, 2017, the cost of food that had been purchased for a party for a staff member's "last day," $25.00 (COUNT 47); and

l.      December 5, 2017, noodles from Royal Kitchen for a "pot luck" OHA Trustees' holiday party, $23.72 (COUNT 48).

Each expenditure made by Respondent AKANA out of Trustee Annual Allowance funds to pay for food [for] herself, other OHA Trustees, and/or OHA staff constituted a separate violation of HRS § 84-13.

Akana argues that she may use her trustee allowance to buy food for staff meetings and for functions where OHA work was done or where OHA beneficiaries attended. She challenges these findings:

174. OHA fiscal staff's understanding of the policy was that Trustees could spend Trustee Allowance funds on food for meetings with outside beneficiaries, but not for internal meetings with staff. As former Controller Kim explained, "we looked for some kind of link that established [that trustees were] working with either beneficiaries or constituents or some kind of other partners that we would typically work with."

175. Trustee food expenditures for staff meetings could be permissible under the policy if there was a "clear business purpose" for the meeting, such as bringing in lunch to a remote location during a staff retreat, and if the expenditure amount was reasonable.

176. However, a Trustee's notation that Trustee Annual Allowance funds were used for a "staff lunch" would not be sufficient to justify a food expenditure because such a notation would not indicate a clear business need for the expenditure.

177. Expenditures for purely internal functions, including a staff birthday party or a going-away party for a staff member, would typically be disallowed under OHA policy.

(Brackets in original) (citations to evidence omitted). OHA's Trustee Allowance Meal Form cites to the Board of Trustees Executive Policy Section 3.5.n, which lets trustees use their allowance to cover "associated costs to attend conferences, seminars or meetings[.]" OHA's Trustee Sponsorship and Allowance Fund Internal Guidelines and Procedures lists permissible spending to include: (a) developing and maintaining an ongoing communication network with beneficiaries and the general public; (b) promoting a broader understanding of Hawaiian issues within the Hawaiian community and among the general public to encourage participating in the resolution of those issues; (c) covering costs of social and charitable functions a trustee is expected to support, including sponsoring or assisting a faith based organization's halau, youth group, extracurricular after school activities and sports activities that do not involve religious practices or activities; (d) covering official travel, registration fees, and associated costs to attend conferences, seminars or meetings; (e) providing support for beneficiaries in their personal quest for self-improvement, capacity building, and education; (f) providing funds to purchase school and educational

supplies and materials, audio-visual presentation equipment, and capacity building aids for schools and organizations; and (g) providing compassionate help to beneficiaries and their families for emergencies, natural disasters, and other times of need.

On Count 38, the Commission found the "purchase of refreshments for a staff meeting was a personal expense rather than an expense that was necessary or required for OHA business." On Count 39, the Commission found the "purchase of food for a staff 'going away' party or for 'morale building' was a personal expense rather than an expense that was necessary or required for OHA business." On Count 40, the Commission found the "purchase of refreshments for a staff meeting was a personal expense rather than an expense that was necessary or required for OHA business." On Count 41, the Commission found the "purchase of food for a birthday lunch celebration for staff or for 'morale building' was a personal expense rather than an expense that was necessary or required for OHA business." On Count 42, the Commission found the "purchase of food for an internal staff meeting was a personal expense rather than an expense that was necessary or required for OHA business." On Count 43, the Commission found the "purchase of food for an internal staff meeting was a personal expense rather than an expense that was necessary or required for OHA business." On Count 44, the Commission found the "purchase of food for an internal staff meeting was a personal expense rather than an expense that was necessary or required for OHA business." On Count 45, the Commission found the "purchase of refreshments for staff was a personal expense rather than an expense that was necessary or required for OHA business." On Count 46, the Commission found the "purchase of lunch for an internal staff meeting was a personal expense rather than an expense that was necessary or required for OHA business." On Count 47, the Commission found the "purchase of lunch for a staff member's last day at work or for 'morale building' was a personal expense rather than an expense that was necessary or

required for OHA business."  On Count 48, the Commission found the "purchase of food for a [Board of Trustees] staff holiday party or for 'morale purposes' was a personal expense rather than an expense that was necessary or required for OHA business." These findings were supported by substantial evidence and were not clearly erroneous.

The Commission found and concluded:

111.  Although OHA policy relating to the purchase of food with Trustee Annual Allowance funds was not the model of clarity, substantial evidence was adduced that Trustees were not allowed to spend Trustee Annual Allowance funds on staff parties, or on purely internal meetings absent some documented need to do so.

112.  Even if OHA policy allowed Trustees to use Trustee Allowance funds for food expenditures without restriction, the State Ethics Code does not.  The Fair Treatment law does not permit an employee to use her official position to obtain unwarranted benefits for herself or anyone else.  The Fair Treatment law prohibits Trustees from using Trustee Allowance funds for food expenditures to obtain unwarranted personal benefits for themselves or other OHA employees.

113.  Respondent Akana used her Trustee Allowance to purchase refreshments or lunches for herself and her staff.  Such expenditures are generally considered personal expenses for state employees unless they are necessary for state business.  In this case, the Fair Treatment law prohibited Respondent's expenditures of Trustee Allowance funds for personal purchases of food for herself and her staff unless the expenditures were necessary or required for state (i.e., OHA) business.

114.  The Commission understands that Hawaii has a cultural practice of using food to express appreciation and Aloha.  The State Ethics Code does not prohibit OHA employees from purchasing food to share with work colleagues.  However, Trustees seeking to purchase food as an expression of appreciation to OHA staff should make these purchases using personal funds rather than the OHA Trustee Allowance, which is specifically dedicated to benefitting Hawaiian beneficiaries by, among other things, promoting a broader understanding of Hawaiian issues or developing a communication network with beneficiaries and the general public.  Using Trustee Allowance funds to purchase food for the office without any clear business need provides OHA employees with an unwarranted benefit in contravention of the Fair Treatment Law and the purpose of the Trustee Allowance fund.

115.  The Commission concludes, based upon competent and substantial evidence, that Respondent Akana's food

purchases were personal expenses and were not necessary or required for OHA business. The purchase of pastries, coco puffs, or manapua for a staff meeting is a personal expense rather than an expense that is necessary for the performance of OHA business. (Counts 38, 40, 42, 43, 45). The purchase of food for a staff lunch — even if work is discussed during lunch -- is also a personal expense unless it is necessary for staff to perform OHA business during lunch (Counts 44, 46). The Commission concludes that Respondent Akana's use of her Trustee Annual Allowance fund to pay for these personal food expenses was an unwarranted personal benefit for Respondent Akana and OHA staff.

116. Likewise, although the Commission understands that a Trustee — or any state agency head -- may wish to promote office morale by purchasing food to celebrate staff birthdays or holiday parties, this was not an allowed expenditure under OHA policy; nor was it allowed under the State Ethics Code. These are personal expenses for which Trustee Annual Allowance funds should not have been used. The State Ethics Code does not permit the expenditure of Trustee Annual Allowance funds (rather than personal funds) on staff birthday, going away, or holiday parties (Counts 39, 41, 47, 48). The Commission concludes that Respondent Akana's use of her Trustee Annual Allowance fund to pay for these personal food expenses was an unwarranted personal benefit for Respondent Akana and OHA staff.

117. The Commission is not persuaded by Respondent Akana's attempt to justify her food expenditures by asserting that members of her staff for whom she purchased refreshments and lunches were also OHA beneficiaries. The evidence clearly showed that Respondent's food purchases were to benefit herself and her "staff" — that is, the employees who worked for her at OHA. The evidence does not support Respondent's contention that she used Trustee Annual Allowance funds to purchase food for her "staff" because they were OHA beneficiaries.

118. Respondent Akana used or attempted to use her official position to secure unwarranted personal benefits for herself and other OHA employees, in violation of HRS § 84-13, by paying for food for herself and/or OHA Trustees and/or OHA staff with Trustee Annual Allowance funds on the following dates:

a. March 17, 2014, "refreshments for staff meeting," from Leonard's Bakery, $17.80 (Count 38);

b. July 3, 2014, food for a staff "going away party", [sic] from 1132 Café & Catering, $268.59 (Count 39);

c. August 4, 2014, food for a staff[]"working meeting," from Liliha Bakery, $31.94 (Count 40);

33

    d.      February 10, 2015, food for a "birthday celebration" for staff, from Zippy's Nimitz, $61.83 (Count 41);

    e.      January 23, 2015, manapua for staff, from Royal Kitchen, $66.49 (Count 42);

    f.      July 9, 2015, food for a "staff meeting," from Liliha Bakery, $39.48 (Count 43);

    g.      December 2, 2015, food for a "working lunch" with staff, from Chinatown Express Ala Moana, $31.01 (Count 44);

    h.      August 15, 2016, "refreshments for staff" from Leonard's Bakery, $20.73 (Count 45);

    i.      October 5, 2016, lunch for a "staff lunch," from Tanaka Saimin, $43.66 (Count 46);

    j.      February 17, 2017, the cost of food that had been purchased for a staff member's "last day," $25.00 (Count 47); and

    k.      December 5, 2017, noodles from Royal Kitchen for a "pot luck" OHA Trustees' holiday party, $23.72 (Count 48).

119.    Each expenditure made by Respondent Akana out of Trustee Annual Allowance funds to pay for food for herself, other OHA Trustees, and/or OHA staff constitutes a separate violation of HRS § 84-13.

120.    Even if one or more of these purchases had been "disallowed" by OHA, such that Respondent Akana eventually used personal funds to pay for the expenditures, each attempt by Respondent Akana to use her official position to make the above-referenced purchases of food constitutes a violation of HRS § 84-13.

These mixed findings and conclusions are supported by substantial evidence in the record, and by the Commission's unchallenged findings. They were not clearly erroneous, and reflect an application of the correct rule of law. The Commission's findings that Akana spending her allowance on refreshments for internal staff meetings, parties, and "morale building" were for her, her staff's, and her fellow trustees' benefit, and not to benefit OHA beneficiaries, was not clearly erroneous. The Commission's conclusions that Akana's spending was an unwarranted privilege in violation of the Fair Treatment Law was not wrong, an abuse of discretion, or arbitrary or capricious.

34

**4.** **Political Contributions.** Akana challenges the Commission's decisions on Counts 49 through 51, which charged:

> 64. Respondent AKANA, by using Trustee Annual Allowance funds to make a political contribution of $50.00 to the Hawaii County Democrats on or about February 11, 2014, used or attempted to use her official position for political purposes — that is, to unfairly benefit a political party — in violation of HRS § 84-13 (COUNT 49).
>
> 65. Respondent AKANA, by using Trustee Annual Allowance funds to make a political contribution of $50.00 to the Democratic National Committee on or about February 11, 2014, used or attempted to use her official position for political purposes — that is, to unfairly benefit a political party — in violation of HRS § 84-13 (COUNT 50).
>
> 66. Respondent AKANA, by using Trustee Annual Allowance funds on or about December 5, 2017 to make a donation of $500.00 to pay for entertainment for the Kanaka Maoli Political Action Committee event, used or attempted to use her official position for political purposes — that is, to unfairly benefit one or more political action committees — in violation of HRS § 84-13 (COUNT 51).

Akana argues that her $50 contributions to the Hawaii County Democrats and the Democratic National Committee were both allowed by OHA, or OHA "at least allowed one and the other was repaid[.]" We've already rejected the argument that Akana could not have violated the Code of Ethics because her spending was not disallowed by OHA.

Akana also argues that her donations were proper because they benefitted "social platforms" and "social events" and that her $500 contribution to Kanaka Maoli was "to pay DeMont Connor for entertainment for Kanaka Maoli, an event presented on January 16, 2018, by the Hoʻomana Pono Political Action Committee and the Ka Lahui Hawaiʻi Political Action Committee."

Akana does not challenge these findings:

**Count 49**

. . . .

> 277. The "Hawaii County Democrats" is affiliated with the Democratic Party of Hawaii, a political party.
>
> 278. Margaret Wille, the Chair of the Democratic Party for the County of Hawaii, was called as a witness by Respondent Akana.

35

279. Every year, there is a county convention of the Democratic Party to which all Democratic candidates and elected officials are invited.

280. The public is invited to attend and watch the event, but only Democratic officials and candidates are allowed to speak:

> Q.    (Respondent's Counsel) And just to be clear, it's not just all elected officials and all candidates within the democratic party. It's bipartisan; is that accurate?
>
> A.    (Ms. Wille) No. It's — it is democrat, all democrats.

Tr. IV:617:25 - 618:10. See also Tr. IV:618:18 - 619:3 ("We don't — we don't invite — there's a republican candidate, they're not invited to speak.").

281. Donations received for the event are used to cover expenses at the event, with any extra proceeds rolled over to the next political event - such as the Grand Rally the night before the primary election.

282. At one of the Hawaii County Democrats' events, some Republicans were handing out materials and Ms. Wille "sort of shooed them"; Republicans would not be permitted to take over the Hawaii County Democrats' event.

. . . .

284. Although Respondent Akana maintains that her $50 donation to the Hawaii County Democrats was for refreshments for the event, she reported it on her quarterly report (January 1, 2014 - March 31, 2014) as a "political contribution."

. . . .

**Count 50**

. . . .

290. The Democratic National Committee is a political party.

291. Respondent Akana's quarterly report (January 1, 2014 - March 31, 2014) included supporting documentation for Respondent's political contribution to the Democratic National Committee. The supporting documentation included a copy of a Democratic National Committee donation form soliciting donations "to help take back the House, protect our Senate majority, and win crucial Democratic victories at all levels."

292. Respondent Akana reported the $50 donation to the Democratic National Committee on her quarterly report as a "political contribution."

. . . .

36

Count 51

. . . .

296. On or about December 5, 2017, Respondent Akana used $500 of Trustee Annual Allowance funds to pay DeMont Connor for entertainment for Kanaka Maoli, an event presented on January 16, 2018, by the Hoʻomana Pono Political Action Committee (HPAC) (of which Mr. Connor was President[)] and the Ka Lahui Hawaiʻi Political Action Committee (KPAC)[.]

297. Respondent Akana reported the $500 payment to DeMont Connor as a "Donation for entertainment for 01/16/18 event" on her quarterly report for October 1, 2017 - December 31, 2017.

298. Respondent Akana's Trustee Allowance Beneficiary/ Organization Donation Form described the purpose of the $500 donation as, "Funding For Entertainment At January 16, 2018 Event."

299. In an email to Respondent Akana's aide Kay Watanabe, dated November 29, 2017, DeMont Connor stated: "Aloha e Kay! Here is the flyer for the event on January 16, 2018. I am NOT asking funding for the political event. My request is for Entertainment."

(Some citations to evidence omitted.)

On Count 49, Akana challenges the Commission's finding that she "used her Trustee Annual Allowance to benefit a political party by making a political contribution to the Hawaii County Democrats on or about February 11, 2014." She acknowledges that OHA's TSAAF Handbook "states explicitly that 'political contributions' are not allowed[.]" But she argues that "the fiduciary duties given an OHA trustee take precedence over OHA internal policy or guidelines." She hasn't explained why she reasonably believed she had a fiduciary duty to give $50 to the Hawaii County Democrats, but not to any other political organization (other than the Democratic National Committee).

The Commission found and concluded:

123. Respondent Akana used or attempted to use her official position to provide an unwarranted benefit to a political party in violation of HRS § 84-13 (Count 49) by making a political contribution of $50 to the Hawaii County Democrats on or about February 11, 2014 with her Trustee Annual Allowance funds (Count 49).

. . . .

37

128. One of the basic precepts of the State Ethics Code is that state employees cannot use state resources (or in this case, resources given to a state employee because of her official position) for political campaign purposes or activities. Additionally, OHA policy clearly prohibited the use of Trustee Annual Allowance funds for political contributions or political action committee events. Thus, Respondent Akana should have been well aware that the use of Trustee Allowance funds for political contributions or political action committee events (Counts 49-51) was prohibited.

These mixed findings and conclusions are supported by substantial evidence in the record, and by the Commission's unchallenged findings. They were not clearly erroneous, and reflect an application of the correct rule of law. On this record, we cannot conclude that the Commission abused its discretion in determining that Akana's spending violated the Fair Treatment Law.

On Count 50, Akana challenges the Commission's finding that she "used her Trustee Annual Allowance to benefit a political party by making a political contribution to the Democratic National Committee on or about February 11, 2014." She makes no specific arguments to challenge the Commission's mixed finding and conclusion:

124. Respondent Akana used or attempted to use her official position to provide an unwarranted benefit to a political party in violation of HRS § 84-13 by making a political contribution of $50 to the Democratic National Committee on or about February 11, 2014 with her Trustee Annual Allowance funds (Count 50).

We cannot conclude that the Commission abused its discretion by determining that Akana's spending violated the Fair Treatment Law.

On Count 51, Akana challenges these findings and conclusions:

II. **FINDINGS OF FACT**

. . . .

300. Notwithstanding Mr. Connor's statement that he was not asking for funding for the "political event" on January 16, 2018, Respondent Akana's donation to Mr. Connor was for the purpose of funding

38

entertainment for the event and therefore directly benefitted the political action committee event.

301. OHA policy prohibited the use of Trustee Annual Allowance funds for this contribution to a political action committee event.

. . . .

303. The Commission finds that Respondent Akana used her Trustee Annual Allowance to benefit one or more political action committees by making a contribution on or about December 5, 2017, for entertainment for the Kanaka Maoli political action committee event presented by HPAC and KPAC.

. . . .

III. **CONCLUSIONS OF LAW**

. . . .

125. Respondent Akana used or attempted to use her official position to provide an unwarranted benefit to one or more political action committees in violation of HRS § 84-13 by using Trustee Annual Allowance funds to make a contribution of $500 on or about December 5, 2017 to pay for entertainment for the Kanaka Maoli Political Action Committee event (Count 51).

Akana argues her spending was for "OHA beneficiaries solely for entertainment purposes." Substantial evidence in the record shows that the entertainment for which Akana paid was part of a political event, and that trustee allowances were not to be used as "resources for the support of any political activity[.]" On this record, we cannot conclude that the Commission abused its discretion by determining that Akana's spending violated the Fair Treatment Law.

> G. **The Commission's findings and conclusions about Akana's violations of the Gifts Reporting Law and Gifts Law were supported by substantial evidence and were neither clearly erroneous nor wrong.**

Counts 1 through 4 alleged that Akana violated the Gifts Reporting Law. The Gifts Reporting Law requires that a state employee file an annual disclosure statement with the Commission if:

> (1)    The . . . employee . . . received directly or indirectly from one source any gift or gifts valued singly or in the aggregate in excess of $200, whether the gift is in the form of money, service, goods, or in any other form;
>
> (2)    The source of the gift or gifts have interests that may be affected by official action or lack of action by the . . . employee; and
>
> (3)    The gift is not exempted by subsection (d) from reporting requirements under this subsection.[7]

HRS § 84-11.5(a) (2012).

Counts 5 and 6 alleged that Akana violated the Gifts Law. The Gifts Law provides:

> No . . . employee shall solicit, accept, or receive, directly or indirectly, any gift, . . . under circumstances in which it can reasonably be inferred that the gift is intended to influence the . . . employee in the performance of the . . . employee's official duties or is intended as a reward for any official action on the . . . employee's part.

HRS § 84-11 (2012).

The Commission found, and Akana does not challenge, that: In 2013, Akana sued the other OHA trustees over OHA's practices and procedures for giving trustees and beneficiaries access to minutes and other records of executive session meetings. The trustee defendants counterclaimed against Akana for breaching her fiduciary duty and revealing privileged and confidential information. Some of Akana's legal fees were paid by Abigail **Kawananakoa**, an OHA beneficiary. Akana's lawsuit and the other trustees' counterclaim were settled in November 2017.

---

[7]    HRS § 84-11.5(d) (2012) exempts gifts: (1) received by will or intestate succession; (2) received from distribution of any inter vivos or testamentary trust established by a spouse or ancestor; (3) from a spouse, fiance, fiancee, any relative within four degrees of consanguinity or the spouse, fiance, or fiancee of such a relative (but a gift from such a person is a reportable gift if the person is acting as an agent or intermediary for any person not covered by HRS § 84-11.5(d)(3)); (4) that are political campaign contributions complying with state law; (5) available to or distributed to the public generally without regard to the official status of the recipient; (6) that, within thirty days after receipt, are returned to the giver or delivered to a public body or to a bona fide educational or charitable organization without the donation being claimed as a charitable contribution for tax purposes; and (7) of approximately equal value exchanged on holidays, birthdays, or special occasions. None of these exemptions apply in this case.

In February 2017 (while Akana's lawsuit was still pending), Kawananakoa sued OHA, OHA trustee and former board chair Robert K. **Lindsey,** and OHA chief executive officer Kamanaʻopono **Crabbe.** Kawananakoa sought to set aside Crabbe's employment contract with OHA. Akana's answer to the charges admitted that Kawananakoa had interests that may have been affected by official action or lack of action by Akana, and that Akana participated in at least one OHA Board of Trustees executive session meeting about Kawananakoa's lawsuit.

Akana challenges these findings and conclusions:

## II. FINDINGS OF FACT

. . . .

21. As an OHA beneficiary who has over many years maintained a personal interest in OHA business, Ms. Kawananakoa had interests that may have been affected by official action or lack of action on the part of Respondent Akana.

. . . .

36. Respondent Akana participated in at least one executive session meeting of the OHA BOT regarding the Kawananakoa v. OHA lawsuit. Further Statement ¶34; Answer ¶1 (admits ¶34).

37. Specifically, Respondent Akana was present for the entire executive session of the BOT on March 9, 2017, in which the BOT consulted with its attorney, Paul Alston, regarding the Kawananakoa v. OHA lawsuit.

. . . .

44. Respondent Akana received the value of Ms. Kawananakoa's gifts — payments of more than $70,000 — in the form of legal services provided by the Bickerton Dang law firm.

. . . .

## III. CONCLUSIONS OF LAW

. . . .

52. Ms. Kawananakoa had interests that may have been affected by official action or lack of action on the part of Respondent Akana, which Respondent admitted in her Answer to the Further Statement of Alleged Violation. Further Statement ¶33; Answer ¶1 (admits to ¶33).

53. Ms. Kawananakoa's interests stemmed from her status as an OHA beneficiary, as the plaintiff in the

41

Kawananakoa v. OHA lawsuit, and as the funder of the Akana v. OHA BOT lawsuit (which Respondent Akana brought in both her individual and official capacities).

. . . .

56.  As the plaintiff in a lawsuit against OHA, Ms. Kawananakoa — the source of the gifts (payments of legal fees) to Respondent Akana — had interests that may have been affected by official action, or lack thereof, by Respondent Akana. Respondent Akana, as a member of the BOT overseeing and directing OHA, a defendant in the lawsuit, could and did participate in at least one executive session meeting in which the OHA Trustees discussed the Kawananakoa lawsuit with their legal counsel and was in a position to take official action affecting Ms. Kawananakoa (such as a recommendation to settle the lawsuit).

57.  As the source of funding for the Akana v. OHA BOT lawsuit, Ms. Kawananakoa had interests that may have been affected — and indeed were affected — by Respondent Akana's decision (Respondent's "official action") to initiate and continue her lawsuit against the other OHA Trustees, and to defend against the other Trustees' counterclaim against her. Ms. Kawananakoa's interests stemmed from her continuing financial support for Respondent Akana's lawsuit and legal defense.

. . . .

60.  The legal fees paid by Ms. Kawananakoa to the Bickerton Dang law firm for legal services provided to Respondent Akana were gifts to Respondent Akana within the meaning of HRS § 84-11.5; Bickerton Dang's legal services, paid for by Ms. Kawananakoa, were "service[s]" that were "received directly or indirectly" by Respondent Akana.

61.  Each of the following payments of legal fees by Ms. Kawananakoa to the Bickerton Dang law firm for legal services provided to Respondent Akana was a gift valued at over $200:

     a.   July 1, 2015 ($10,478.52) (Count 1);

     b.   August 10, 2015 ($9,521.48) (Count 2);

     c.   March 24, 2016 ($6,000.00) (Count 3);

     d.   April 19, 2016 ($24,125.50) (Count 4).

62.  None of these gifts were exempted by HRS § 84-11.5(d) from the gifts reporting requirements.

63.  Gifts received at different times must be reported separately: HRS § 84-11.5 requires an individual filing a gifts disclosure statement to report "[t]he date the gift was received[.]" HRS § 84-11.5(c)(3); see also HRS § 84-11.5(a)(l) (requires reporting of "any gift or gifts valued singly or in the aggregate

in excess of $200, whether the gift is in the form of money, service, goods, or in any other form").

64. Each payment of legal fees by Ms. Kawananakoa to the Bickerton Dang law firm for legal services provided to Respondent Akana, constituted a separate and distinct, reportable gift for purposes of HRS § 84-11.5.

65. Respondent Akana was clearly required to report each payment of legal fees by Ms. Kawananakoa to the Bickerton Dang law firm on an annual gifts disclosure statement filed with the Commission, by the deadlines set forth in HRS § 84-11.5.

66. Respondent Akana was required to report Ms. Kawananakoa's payment of legal fees on July 1, 2015 ($10,478.52) by the statutory deadline of June 30, 2016 (Count 1).

67. Respondent Akana was required to report Ms. Kawananakoa's payment of legal fees on August 10, 2015 ($9,521.48) by the statutory deadline of June 30, 2016 (Count 2).

68. Respondent Akana was required to report Ms. Kawananakoa's payment of legal fees on March 24, 2016 ($6,000) by the statutory deadline of June 30, 2016 (Count 3).

69. Respondent Akana was required to report Ms. Kawananakoa's payment of legal fees on April 19, 2016 ($24,125.50) by the statutory deadline of June 30, 2016 (Count 4).

70. Respondent Akana's contention that she did not need to report these legal fees and that they were not "gifts" because she received them in her "official capacity" is wholly without merit: if she were correct, then state employees could simply ignore HRS § 84-11.5 altogether by claiming that gifts — whether cash, meals, tangible goods, or services — were being provided to them in their official capacities. This contradicts the plain language of HRS § 84-11.5.

71. Respondent Akana accepted Ms. Kawananakoa's offer to pay for her legal fees. It was incumbent upon Respondent to ascertain the value of these legal fees for gift reporting purposes and to report these gifts in a timely fashion as required by HRS § 84-11.5. Her claim that she was not provided with copies of the Bickerton Dang law firm's invoices and that, during the course of the litigation, she did not know the specific amounts of her legal fees does not absolve Respondent of her responsibilities under the State Ethics Code.

72. Respondent Akana violated HRS § 84-11.5 by failing to report a gift (the payment of Respondent's legal fees) from Ms. Kawananakoa received on July 1, 2015 ($10,478.52) by the statutory deadline of June 30, 2016 (Count 1).

73.    Respondent Akana violated HRS § 84-11.5 by failing to report a gift (the payment of Respondent's legal fees) from Ms. Kawananakoa received on August 10, 2015 ($9,521.48) by the statutory deadline of June 30, 2016 (Count 2).

74.    Respondent Akana violated HRS § 84-11.5 by failing to report a gift (the payment of Respondent's legal fees) from Ms. Kawananakoa received on March 24, 2016 ($6,000.00) by the statutory deadline of June 30, 2016 (Count 3).

75.    Respondent Akana violated HRS § 84-11.5 by failing to report a gift (the payment of Respondent's legal fees) from Ms. Kawananakoa received on April 19, 2016 ($24,125.50) by the statutory deadline of June 30, 2016 (Count 4).

. . . .

86.    Respondent Akana's continued acceptance of gifts of legal fees — on two occasions, totaling more than $21,000 — after Ms. Kawananakoa filed a lawsuit against OHA, creates a reasonable inference "that the gift is intended to influence [Respondent Akana] in the performance of [Respondent Akana's] official duties or is intended as a reward for any official action on [Respondent Akana's] part." HRS § 84-11.

87.    A reasonable person clearly could — and, the Commission believes, would — infer that a donor who pays for more than $21,000 of services to an elected official after suing that official's agency intends to influence that official.

. . . .

97.    Respondent Akana contends that she did not violate the Gifts law because she was not asked to give anything in return for Ms. Kawananakoa's payment of legal fees and the payment of these fees did not result in any official acts by Respondent benefitting Ms. Kawananakoa. The Commission concludes that Respondent's contention is without merit. A donor's actual intent in giving a gift does not determine whether a gift is prohibited by the Gifts law; similarly, it does not matter whether the gift actually influences the recipient's actions. If a gift is given under circumstances where it can <u>reasonably be inferred</u> that an intent to influence or reward exists, the gift is prohibited. This interpretation of the Gifts law fully comports with the plain language of the law as well as the purpose of the State Ethics Code to preserve public confidence in public officials.

98.    Respondent Akana violated HRS § 84-11 by accepting a gift (the payment of Respondent's legal fees) from Ms. Kawananakoa on or about April 28, 2017 ($15,513.15) when the OHA BOT, including Respondent Akana, was engaged in the <u>Kawananakoa vs. OHA</u> lawsuit (Count 5).

44

> 99. Respondent Akana violated HRS § 84-11 by accepting a gift (the payment of Respondent's legal fees) from Ms. Kawananakoa on or about June 17, 2017 ($6,000.00) when the OHA BOT, including Respondent Akana, was engaged in the <u>Kawananakoa vs. OHA</u> lawsuit (Count 6).

(Citation omitted.)

The Commission weighs three factors to determine whether a gift is prohibited under the Code of Ethics: (1) the value of the gift; (2) the relationship between the recipient and the donor, including whether the recipient takes official action regarding the donor; and (3) whether the gift benefits the recipient personally or serves legitimate state interests. <u>Haw. State Ethics Comm'n Advisory Op. No. 2018-002</u>, 2018 WL 4599569, at *2 (June 21, 2018). Akana argues that she may accept Kawananakoa paying her attorneys' fees because her lawsuit against the other trustees was brought to further the interests of OHA beneficiaries. She misses the point. Kawananakoa paying Akana's attorneys' fees for her lawsuit against the other trustees could reasonably be seen as possibly influencing Akana's position on Kawananakoa's lawsuit against OHA. The value of the gift — over $70,000 — satisfies the first factor.

Akana argues she had no significant relationship with Kawananakoa before Kawananakoa began paying her attorneys' fees. But this weighs against any inference that Kawananakoa paid Akana's attorneys' fees out of friendship, and supports the inference that Kawananakoa paid Akana's attorneys' fees to try to influence the positions taken by Akana in the <u>Kawananakoa v. OHA</u> lawsuit. Akana also argues "the unrebutted evidence [shows] that no action had ever been taken on" Kawananakoa's lawsuit. She again misses the point. Akana, as a trustee, could influence OHA's decisions on Kawananakoa's lawsuit. No action — rather than aggressive defensive action — being taken could have been the result of Akana's influence. The second factor was satisfied.

Akana notes that the Commission made no finding on the third factor, because it felt the strength of the first two

factors made the third factor inconsequential. Still, she argues that she did not benefit from Kawananakoa's payment of her attorneys' fees. The Commission found, and Akana doesn't challenge, that the Bickerton Dang law firm provided legal services to Akana for her lawsuit against the other trustees. Akana offered no evidence to the Commission that she would not have been personally liable for her attorneys' fees had Kawananakoa not paid them. The record indicates that the third factor was also satisfied.

The Commission's findings, conclusions, and mixed findings and conclusions were supported by substantial evidence and by the Commission's unchallenged findings, and reflected a correct application of the law. They were neither clearly erroneous nor wrong. The Commission did not abuse its discretion by deciding that Akana violated the Gifts Reporting Law and the Gifts Law.

### H. Akana waived her appeal from the order denying her motion for a stay.

Akana contends the circuit court abused its discretion by denying her request for a stay pending appeal and concluding the factors under HRS § 91-14(c) were not met. Akana's opening brief makes no discernable argument on this point. The Commission argues the point should be deemed waived. Akana's reply brief argues the point should not be deemed waived because it involved motions briefed and argued in the circuit court, her argument on this point was referenced in her statement of the points of error, and the argument was not made in her opening brief for economy. Attempts to incorporate by reference in the opening brief arguments made before the trial court violate the 35-page limitation in HRAP Rule 28(a). <u>Kapiolani Com. Ctr. v. A & S P'ship</u>, 68 Haw. 580, 584-85, 723 P.2d 181, 184-85 (1986) ("Since this is in violation of our rules, we will disregard those points.").

**I.    The circuit court retained jurisdiction to rule on the Commission's motion to amend the judgment.**

Akana contends that her notice of appeal immediately divested the circuit court of jurisdiction to grant the Commission's motion to amend the judgment.  The Commission argues this point too should be deemed waived because it was not argued in Akana's opening brief.  But "lack of subject matter jurisdiction can never be waived by any party at any time." Ditto v. McCurdy, 103 Hawaiʻi 153, 157, 80 P.3d 974, 978 (2003) (citation omitted).

The Commission's motion to amend was filed within the time required by Hawaiʻi Rules of Civil Procedure Rule 59(e).  The circuit court's jurisdiction was extended for up to 90 days after the motion was filed.  See HRAP Rule 4(a)(3) ("The presiding court or agency in which the motion was filed shall dispose of any such post-judgment motion by entering an order upon the record within 90 days after the date the motion was filed.").  The circuit court retained jurisdiction to enter the Amended Final Judgment.

The Amended Final Judgment substantially and materially altered the Final Judgment by adding fines of $23,106.53 against Akana.  Ordinarily, if amendment of a final judgment materially alters rights or obligations determined by the prior judgment, a notice of appeal from the amended judgment must be filed.  See Korsak v. Haw. Permanente Med. Grp., 94 Hawaiʻi 297, 304, 12 P.3d 1238, 1245 (2000).  But the Final Judgment affirmed the Commission's imposition of the fines; it just didn't liquidate the amount.  Akana's notice of appeal was timely as to the Amended Final Judgment under HRAP Rule 4(a)(2) ("If a notice of appeal is filed after announcement of a decision but before entry of the judgment or order, such notice shall be considered as filed immediately after the time the judgment or order becomes final for the purpose of appeal.").

## V. CONCLUSION

For all of these reasons, the circuit court's Amended Final Judgment and the Commission's Findings of Fact, Conclusions of Law, and Decision and Order are affirmed.

DATED:  Honolulu, Hawaiʻi, January 22, 2024.

On the briefs:

James J. Bickerton,
Bridget G. Morgan-Bickerton,
Stephen M. Tannenbaum,
Jeremy K. O'Steen,
for Respondent-Appellant-
Appellant.

Kalikoʻonalani D. Fernandes,
Solicitor General,
State of Hawaiʻi,
for Complainant-Appellee-
Appellee.

/s/ Katherine G. Leonard
Acting Chief Judge

/s/ Keith K. Hiraoka
Associate Judge

/s/ Karen T. Nakasone
Associate Judge